## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 310 | **DATE** | 6/10/2002 |
| **CASE TITLE** | United States of America vs. Fawell, et al. | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ■  Status hearing set for 6/13/02 at 9:00 a.m.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter Memorandum Opinion and Order.  Government's motion to disqualify counsel (Doc. No. 15-1) is granted.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 1 1 2002 | |
| | Docketing to mail notices. | | date docketed | 38 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 6/7/2002 | |
| ETV | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

Minute Order: Form (06/97)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

JUN 1 1 2002

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 02 CR 310 |
| | ) | |
| **SCOTT FAWELL,** | ) | |
| **CITIZENS FOR GEORGE RYAN,** | ) | **Judge Rebecca R. Pallmeyer** |
| **RICHARD JULIANO** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this ten-count indictment, the United States charges Citizens for George Ryan, Sr., ("CFR") and its campaign manager, Defendant Scott Fawell, with violations of RICO. The indictment alleges that from 1992 until 1999, the enterprise defrauded the people of Illinois by using personnel and resources of the Illinois Secretary of State's office to conduct political campaigns for then-Secretary of State George Ryan. During the course of the grand jury's investigation of these charges and other matters, CFR has been represented by the Chicago law firm of Altheimer & Gray (hereinafter "Altheimer" or "the Firm"). The United States now asks the court to disqualify Altheimer from further representation of CFR. The government argues that disqualification is warranted for three reasons:

- Altheimer previously represented co-Defendant Scott Fawell in Mr. Fawell's appearance before the grand jury. Mr. Fawell has declined to give an unequivocal waiver of any conflict that may arise between himself and his former attorneys.

38

- Altheimer has previously represented the Secretary of State's office, the victim of the alleged wrongdoing. That office has expressly declined to waive any conflict of interest generated by the previous retention.

- Altheimer appeared on behalf of dozens of individuals who testified before the grand jury, including some five to ten individuals the government expects to call as witnesses at the trial in this case.

CFR vigorously contests the motion. It argues that the conflicts identified by the government are either speculative or subject to waiver. Further, CFR offered the formal waiver of its treasurer, Bernard Weiner. After the court expressed concern that Mr. Weiner had little direct involvement with CFR, CFR presented the additional signed waiver of its beneficiary, Governor George Ryan. In addition, CFR has now obtained signed waivers of conflict from each of the witnesses whose testimony the government expects to elicit. These waivers do address some of the concerns raised by the government's motion. The court concludes, nevertheless, for the reasons discussed here, that the Firm's earlier representation of Scott Fawell requires that the motion be granted. In light of the significance of this motion, the court will address the matters of the Firm's earlier activities on behalf of the Secretary of State's Office, and its representation of other witnesses before the grand jury, as well. Finally, the court presents briefly the reasons for its conclusion that the government did not delay unreasonably in bringing this motion.

## DISCUSSION

As CFR correctly argues, the constitutional presumption is is in favor of its own

choice of counsel: The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U. S. CONST. amend VI; *see Wheat v. United States*, 486 U.S. 153, 158-59 (1988). Disqualification of chosen counsel can have severe consequences, particularly in situations where, as here, the attorneys have represented the client for several years at substantial expense. CFR starts with a presumption favoring its right to choose Altheimer as its counsel, and the government bears "a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualification." *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986), quoted in *United States v. Micke*, 859 F.2d 473, 480 (7th Cir. 1989); *United States v. Lowry*, 971 F.2d 55, 64 (7th Cir. 1992) (government bears a heavy burden to show that court should decline a waiver of conflict).

Still, the Supreme Court has recognized that this presumption in favor of counsel of the defendant's choice is not absolute. That presumption can be overcome if continued representation by the defendant's chosen attorneys would generate either an actual conflict of interest, or a serious potential for such a conflict. *Wheat,* 486 U.S. at 164. As the *Wheat* court observed, "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160. In a pre-*Wheat* case, the Seventh Circuit affirmed a decision to disqualify a defense attorney who had previously represented a government witness, but declined to adopt

a *per se* rule of disqualification under such circumstances. *United States v. O'Malley*, 786 F.2d 786, 790 (7th Cir. 1986). Instead, the court explained, given the weight of the defendant's constitutional right to counsel of its choice, the decision to disqualify an attorney in a criminal case would require an "evaluation of the interests of the defendant, the government, the witness and the public in view of the circumstances of each particular case." *Id.*

**The Firm's Previous Representation of Scott Fawell**

In the court's view, the most important matter raised by the government in support of its motion to disqualify Altheimer is the firm's prior representation of co-Defendant Scott Fawell. There may well be a conflict of interest between the two Defendants, the government urges, arguing that the court must disqualify the Firm absent an unequivocal waiver of that conflict. This court has adopted Rules of Professional Conduct which address the restrictions on lawyers that arise from previous retention. Specifically, Local Rule 83.51.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

CFR dismisses the government's concerns. CFR acknowledges that the Firm's lawyers did accompany Mr. Fawell to the grand jury in October 1998, but claims that was in Fawell's capacity as a then-CFR employee. Altheimer says it did not have an attorney-client relationship with Mr. Fawell in his personal capacity. Thus, CFR urges, Mr. Fawell has no standing to object to CFR's representation by Altheimer and no waiver

4

is required. In fact, according to CFR, there will be no conflict between CFR's defense and that of its executive and manager, Scott Fawell.

The court believes the matter is more complicated. First, although the court had assumed the Firm represented Mr. Fawell solely in his official capacity, his affidavit raises a question concerning that issue. In his affidavit, Fawell asserts that he consulted with Attorney Jeremy Margolis of Altheimer in September 1998, in response to two subpoenas served on CFR. (Fawell Affidavit, Ex. 16 to CFR's Response Memorandum.) He appeared before the grand jury on October 13, 1998 and at that time was, in Fawell's words, "personally served with a subpoena." (*Id.* ¶ 3.) In his testimony, Fawell referred to Mr. Margolis as "my attorney" and "my lawyer." Asked specifically, "You also have an attorney here and have consulted an attorney, Mr. Margolis, correct?" Fawell responded, "Correct."

Unless Mr. Fawell made a "relatively clear indication" that he believed Mr. Margolis was representing him individually, Mr. Fawell's subjective belief would not be sufficient to establish the existence of an attorney/client relationship "without some finding that the potential client's subjective belief is minimally reasonable." *United States v. Evans*, 113 F.3d 1457, 1465 (7th Cir. 1997), citing *United States v. Keplinger*, 776 F. 2d 678, 701 (7th Cir. 1985). At oral argument on this motion, CFR's attorneys asserted that they represented Mr. Fawell "in his capacity as an employee of Citizens for Ryan," but that "[w]hen he got there I guess they handed him yet another subpoena that had his name on it, which clouds the issue." (Transcript of May 9, 2002 proceeding, Exhibit 1 to CFR's Supplemental Memorandum (hereinafter, "5/09/02

5

Transcript", at 13-14.) Mr. Fawell's attorney demonstrated that he believes the "relatively clear indication" and "minimally reasonable" tests have been met:

[BY MR.GENSON:]

We don't have to explore it [Mr. Fawell's waiver], Judge. It's a simple matter. We quoted . . . the grand jury testimony of Mr. Fawell relative to this issue. I think it begins and ends there. I don't at this point want to put Mr. Fawell on the witness stand or subject him to any examination regarding this issue.
    I mean, he went in front of the grand jury. He said what he said in front of the grand jury. He was asked if he had an attorney there. He said he had Mr. Margolis. It's as simple as that. I don't want to go beyond that, at least not at this point.

[BY MR. FLESSNER]:

I am not sure that ultimately –

[BY MR. GENSON]:

Mr. Margolis can respond. Our position is set out in the motion, Judge.

. . .

[BY MR. FLESSNER]:

The inquiry as to what, if any, discussions were had between Mr. Margolis and Mr. Fawell and the understanding of Mr. Fawell in that I don't think has been entirely explored. I think perhaps we could do that.

(5/09/02 Transcript at 22-23.) CFR did in fact submit additional materials after the May 9 hearing, including the affidavit of Governor George Ryan, the affidavit of Attorney William Martin, and the affidavit of ten witnesses that they conveyed no confidences to the Firm and provided no inconsistent information to the grand jury. Notably absent from those submissions is any statement or comment from Mr. Margolis concerning the nature of his relationship with Mr. Fawell. In its initial

6

response to this motion, CFR had argued that it should be denied "[e]ven if Mr. Fawell could be considered [the Firm]'s former client . . . ." (CFR's Response Memorandum at 23.) In its supplemental response, CFR argued that the Firm had no personal attorney relationship with Mr. Fawell "simply due to its relationship with CFR." (CFR's Supplemental Response, at 10.) Neither submission satisfies the court that Mr. Fawell did not have a "minimally reasonable" understanding that Mr. Margolis represented him personally. *Cf. Keplinger,* 776 F.2d at 700 (attorneys testified that individual defendants never explicitly sought individual legal advice; one attorney testified that he told one of the individual defendants explicitly that the attorney was not the defendant's lawyer); *Evans,* 113 F.3d at 1467 (trial court's determination that there was no personal attorney/client relationship was properly based on the attorney's testimony). For purposes of this motion, the court concludes that Mr. Margolis represented Mr. Fawell in his personal capacity as well as his capacity as manager of CFR.

As his former attorney, the Firm owes Mr. Fawell a duty of confidentiality and loyalty. That duty may well conflict with the Firm's duty to CFR. Of course, some evidence of wrongdoing on the part of Fawell would also constitute evidence against CFR, for which the interests and defense postures of these Defendants will be identical. There are other possibilities, however. To the extent that Fawell's own knowledge or intentions are an issue, he may suggest an explanation for his actions that implicates CFR officials or counsel. In fact, at oral argument on this motion, the prosecutor stated without contradiction that "Mr. Fawell's lawyer has represented to the government .

7

. . that [Mr. Fawell] may in fact want to call Mr. Margolis or someone from Altheimer & Gray to assert potentially on advice of counsel or other defenses." (5/09/02 Transcript at 12.) For its part, CFR may attempt to distance itself from Fawell's activities, arguing that some or all of Fawell's conduct was unauthorized by CFR and was a violation of his responsibilities to the organization. Indeed, as part of a vigorous defense, CFR will be entitled to argue not only that Fawell's actions were not improper or that Fawell did not commit the charged conduct; it may also argue that he did, but that his action was not under CFR's direction and control. Governor Ryan himself, who has waived conflict on the part of CFR, has not been charged with any crime and has publicly stated that he was unaware of any misconduct on the part of persons in his office or campaign and disapproves of it. There can be little doubt that Mr. Fawell's defense posture and interests may at some point diverge from those of CFR.

Further, Fawell is charged with some crimes that may not implicate CFR at all; should he take the stand in his defense, the government will no doubt emphasize the evidence of these alleged offenses, which relate directly to Fawell's credibility. The indictment charges, for example, that Fawell committed perjury in his appearance before the grand jury. (Indictment, Count VI.) The indictment also charges that Fawell took no efforts to preserve relevant and material documents and instead altered document retention policies to prevent communication of material documents to the grand jury. (*Id.* Count V.) In Count X, Fawell is charged with failing to report income. The government's efforts to prove these offenses heightens the possibility of a rift between Fawell and his former attorneys.

In light of this conclusion, the court agrees with the government that disqualification may be warranted absent an unequivocal waiver of the conflict. Unfortunately, Mr. Fawell has not furnished such an unequivocal waiver. Instead, his counseled written waiver is couched in guarded language:

> Based on my consultations with counsel, and upon careful consideration of the issues raised by the government's motion, I *presently* have no objection to Altheimer & Gray's representation of CFR in this matter. *At this time* I do not intend to call any lawyer or employee of Altheimer & Gray as a witness in these proceedings. *Given what I know about this case at this time,* I hereby waive any right I would otherwise have . . . to raise Altheimer & Gray's representation of CFR as any defense in this matter.

(Id. ¶ 6, emphasis supplied.) The careful phrasing in Mr. Fawell's affidavit gives the court no assurance that a conflict between himself and his own previous lawyers will not evolve. In fact, when questioned about the content of their drafting of his affidavit, Mr. Fawell's attorneys confirmed that the words were carefully chosen and that Mr. Fawell is unwilling to broaden his waiver. (5/09/02 Transcript at 13.) The interests of the parties, the public, and the court are in seeing the trial of this proceed fairly but swiftly. Mr. Fawell's affidavit leaves open a genuine possibility that a conflict arising later will impede those interests.

The court concludes for this reason that the government's motion to disqualify Altheimer should be granted.

### The Firm's Prior Representation of the Office of Secretary of State

In addition to the conflict relating to Mr. Fawell, the government argues, that Altheimer is prohibited from representing CFR because the Firm previously

represented the Office of the Secretary of State. According to the United States, Altheimer's representation of CFR also runs squarely afoul of Rule 83.51.9(a). Altheimer previously represented the Office of the Secretary of State in connection with an investigation of corruption and response to grand jury subpoenas. That Office is a victim of the alleged RICO enterprise, according to the Government, and its interests are therefore materially adverse to those of CFR in this prosecution. When asked her position on the potential conflict, the Secretary's Executive Counsel expressly declined to waive it. (*See* Letter of Donna M. Leonard, Ex. B to Motion to Disqualify.)

Altheimer's response to this argument is less than satisfying. The Firm contends its previous representation of the Secretary of State's office was not substantially related to this matter and was "limited," lasting only from April 1998 through May 1999 and relating only to the production of four boxes of documents at a single driver's license facility. It is undisputed that the Firm's central responsibility in its 1998-99 engagement was to perform an independent review of the Secretary's own internal investigation of charges of corruption in the issuance of commercial driver's licenses. The government characterizes this effort, and other work performed by the Firm on behalf of the Secretary, as substantial: It required the Firm to gather, review, and produce some eleven boxes of documents, including documents relating to the Secretary's own internal investigation of charges of corruption, review of personnel files, disciplinary files, office policies, information concerning the issuance of commercial driver's licenses, testing and re-testing for such licenses, and files relating

10

to driving schools.

In addition to this substantial document review and production, Altheimer lawyers met with Secretary of State employees and accompanied an official to the United States Attorney's office to provide information concerning re-testing of drivers in Florida. That individual will, according to the United States' moving papers, be a witness at the trial in this case. Further, in 1999 the Firm gathered and produced documents in response to grand jury subpoenas issued to the Secretary relating to the activities of Larry Hall. Hall, too, who has since been indicted and convicted, will likely be a government witness. (United States' Supplemental Submission, at 5.) At or near the same time that the Firm produced documents in response to a subpoena to CFR, it also accumulated materials on behalf of the Secretary in connection with a private civil case brought by victims of a tragic truck accident against the responsible driver, whose license allegedly was obtained in the fraud scheme that has resulted in dozens of federal indictments. (*Id.*)

According to a July 1999 report ("Ryan's Political War Chest Paid for Advice During Licensing Probe," *Chicago Tribune*, July 31, 1999, Ex. O to Motion to Disqualify), CFR itself paid the Firm for this work it performed on behalf of the Secretary. Those efforts resulted in a conclusion that the Secretary's own prior investigations had been conducted thoroughly and that no further investigation was warranted. As the United States points out in its reply memorandum, in a late 1998 television appearance, Altheimer attorney Jeremy Margolis characterized the prior investigations of corruption as thorough, diligent, and professional, and specifically

11

dismissed the notion that there was any campaign-motivated component to the alleged corruption. (Reply Memo at 4, citing videotape of October 14, 1998 *Chicago Tonight* broadcast.) In its capacity as CFR counsel, Altheimer will surely want to embrace those conclusions, but they appear now to be in conflict with the Secretary of State's own interests. Furthermore, the Firm's and Mr. Margolis's role in conducting a purported independent investigation and making public statements concerning their conclusions potentially compromises the Firm's ability to exercise independent professional judgment on CFR's behalf.

Altheimer insists the language of Rule 1.9 does not require its disqualification here. First, any confidences that public officials may have shared with Altheimer are no longer a basis for precluding the firm's involvement in this case, says the firm, now that the Seventh Circuit has upheld Judge Aspen's decision in *In re: A Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002) that a state government lawyer may not invoke the attorney-client privilege to refuse to disclose communications with a state officeholder. The government sees irony in this argument, as it was Altheimer lawyers who represented state constitutional office holders in that appeal – apparently without the knowledge or authorization of the Illinois Solicitor General – and urged reversal of Judge Aspen's decision. (United States Reply Memo, at 8; April 30, 2002 letter of Solicitor General Joel Bertocchi, Ex. A to Reply Memo.) Although the government has not identified any Altheimer lawyer or employee as a potential witness, the government points out that this recent decision means that Altheimer personnel who consulted with state office holders may be

questioned about those communications. In other words, the decision places those employees "squarely in the camp of potential witnesses, either for the prosecution or the defense." (Reply Memo, at 8.)

Irony aside, the court does not agree that the Seventh Circuit's recent decision eliminates the conflict resulting from Altheimer's prior representation of the Secretary of State. That suggestion assumes that the purpose of Rule 1.9(a) is limited to protecting the former client's secrets. Other courts and commentators do not view the purpose so narrowly; they conclude instead that the prohibition against representation of another person in a same or substantially related matter relates both to the lawyer's duty of confidentiality and his or her duty of loyalty to that former client. *See Perillo v. Johnson*, 205 F.3d 775, 801 (5th Cir. 2000). Thus, the court is called upon to consider whether "counsel's representation of the second client will call the validity of the lawyer's services or the work product produced for the former client into question, or [whether] counsel will be representing adverse interests in the same or a substantially related matter." *Id. See also* Geoffrey C. Hazard & Susan P. Koniak, THE LAW AND ETHICS OF LAWYERING 658 (1990) ("two underlying concerns of the substantial relationship test [are]: the duty to preserve confidences and the duty of loyalty to a former client."); *In re American Airlines, Inc.,* 972 F.2d 605, 619 (5th Cir. 1992) ("because the substantial relationship test is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences."); *E.F.*

*Hutton & Co. v. Brown*, 305 F. Supp. 371, 395 (S.D. Tex. 1969) ("If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself--a relationship which must be one of trust and reliance--they can only undermine the public's confidence in the legal system as a means for adjudicating disputes.").

The court recognizes that much of this case law relates to civil litigation, where the standards for disqualification differ because the Sixth Amendment is not at play. *See United States v. O'Malley*, 786 F.2d 786, 789 n.3 (7th Cir. 1986). The court disagrees with CFR's argument, however, that no case suggests that an attorney's representation of a crime victim, standing alone, disqualifies him or her from representing the alleged perpetrator. In *United States v. Alex*, 788 F. Supp. 359 (N.D. Ill. 1992), the court disqualified attorneys seeking to represent a criminal defendant in an extortion trial. In that case, the attorneys' previous clients were in fact expected to be called as witnesses, but in concluding that the disqualification motion must be granted, the court emphasized the "substantial interest" test of Rule 1.9(a): "[T]he former clients and alleged victims have an interest in seeing that [defendants] are convicted. Conversely, [the attorney's new client] has a great interest in being acquitted of all charges. These interests are diametrically opposed and may not be reconciled." *Id.* at 362.

Whatever confidentiality or loyalty concerns may be implicated by its previous representation of the Secretary of State, the Firm urges, those concerns do not arise where the previous client was neither a victim nor a government witness. The Firm

14

insists that the Secretary of State's Office can not be both the RICO enterprise and the alleged victim of CFR's wrongdoing. The United States responds to this argument by asserting that the indictment does not name the Secretary of State's Office as part of the enterprise. (Reply Memorandum, at 5-6.) It further challenges CFR's "no dual role" argument, citing legislative history and case law to the contrary. *See, e.g., United States v. Goldin Industries, Inc.*, 219 F.3d 1268, 1270 (11th Cir. 2000) ("the [RICO] enterprise itself can be a passive instrument or victim of the racketeering activity."); *Aetna Casualty and Surety Co. v. P Y B Autobody*, 43 F.3d 1546, 1557 (1st Cir. 1994) ("Under § 1961 an enterprise may include a legitimate legal entity like Aetna as the victim of the racketeering activity"); *LaSalle Bank Lake View v. Seguban*, 937 F. Supp. 1309, 1322-24 (N.D. Ill. 1996) (after Seventh Circuit questioned whether enterprise can also be victim, district court on remand rejected conclusion that simultaneous role is not possible). The court is not prepared to decide this issue, which the court understands CFR intends to address more substantively; but it is not so clear as a matter of law that the Secretary of State cannot be both instrument and victim of a RICO enterprise that the court would deny the government's motion on this basis.

Even if the court characterizes the Secretary of State's Office as a victim, CFR urges, Rule 1.9(a) does not apply because the Office itself will not be a witness. Again, the government challenges this position. As discussed more fully below, the government represents that several employees of the Secretary of State, including some represented in their official capacities by the Firm, will in fact be witnesses. In any event, the plain language of Rule 1.9(a) does not refer to the former client's

15

potential role as a witness. Further, at least one court has declined to adopt CFR's proposed functional analysis of this issue. In *Welch v. Paicos*, 26 F. Supp. 2d 244 (D. Mass. 1998), a federal court addressing an analogous Massachusetts provision observed that the rule gives the court "no discretion to defer, sua sponte, consideration of possible conflicts. Since adverse representation by a conflicted lawyer damages the former client on an ongoing basis," the court cannot defer consideration of the disqualification absent a waiver of the conflict by the previous client. *Id.* at 247. As noted, the Secretary of State has explicitly declined to waive the conflict.

The court concludes that Altheimer's previous representation of the Secretary of State's Office raises serious concerns about its ability to represent CFR in this criminal proceeding. In reaching this conclusion, the court recognizes that Altheimer lawyers see no conflict between the work they did on behalf of the Secretary of State in 1998 and 1999 and their posture on behalf of CFR today. In both settings, Altheimer takes the position that there was no unlawful conduct and no chargeable corruption in the Secretary of State's office. Since 1999, however, numerous Secretary of State officials and employees have pleaded guilty to corruption charges. More significantly, the grand jury has found probable cause to believe that Defendants CFR and Fawell misused the public resources of the Secretary of State through a pattern of racketeering activity. The Secretary of State's interests now appear to be aligned with those of the United States in seeking convictions for unlawful conduct and an award of restitution. Rule 1.9(a) perhaps has more frequent application in a context where a previous client will be a government witness; but in this court's view, the plain

language of that Rule also fits here and casts a dark shadow over the propriety of Altheimer's role as lawyer for Defendant CFR.

## Firm's Former Clients as Witnesses

Yet another argument for disqualification of Altheimer & Gray relates to the Firm's representation of dozens of witnesses before the grand jury. Some five to ten of these individuals will, according to the government, be trial witnesses as well. The government asserts that their interests will be materially adverse to those of Defendant CFR, creating a conflict too significant to be subject to waiver.

Defendant CFR has made a substantial effort to address this issue. First, as CFR notes, an attorney's prior representation of government witnesses does not always require disqualification, so long as appropriate waivers are obtained and appropriate safeguards are established. Since the filing of the motion to disqualify the Firm, CFR has hired Thomas M. Breen, an experienced former prosecutor and criminal defense attorney, to conduct cross-examinations of the ten persons identified by the government as potential trial witnesses. (CFR's Supplemental Memorandum, at 3.) This procedure – of "screening off" a conflicted attorney for purposes of cross-examination – was approved by the Seventh Circuit only last month in *United States v. Britton,* No. 01-2074, ___ F.3d ___, 2002 WL 922106 (7th Cir. May 8, 2002). *Compare United States v. O'Malley,* 786 F.2d 786, 793 (7th Cir. 1986) (affirming disqualification order where defense counsel previously represented government witness, noting that "[a]t no time did [counsel] suggest any restriction which would limit his examination of [the witness] in a way that would protect" the attorney/client

relationship and the interests of the government and the public); *United States v. Moscony*, 927 F.2d 742, 750 (3rd Cir. 1991) (same result where conflicted attorney "did not attempt to cure the conflict of interest problem by offering to forego cross-examination" of government witnesses he had previously represented).

In addition, CFR has obtained a written waiver from each of the potential witnesses. According to these witnesses' affidavits, each has received independent counsel concerning the Firm's potential conflict, and each believes he or she has provided no information to the Firm that is inconsistent with that witness's statements to the government or that could be used to impeach the witness at trial. (Exhibits 4-13 to CFR Supplemental Memorandum.) CFR purports to be unconcerned about the prospect that its lead attorneys will decline to cross-examine "one, five or even ten discrete witnesses." ( CFR Supplemental Memorandum, at 4.) The court finds CFR's comfort level at least curious: The government asserts one of these witnesses has testified that agents of CFR diverted state personnel and state property, falsified state personnel records, directed the purchase of an industrial shredder, and shredded documents after September 4, 1998. (Reply Memorandum at 9-10.) Another of the witnesses that Altheimer attorneys have agreed they will not cross-examine would testify that CFR agents destroyed documents at the Secretary of State's own office and at a CFR office, authorized the diversion of state personnel for political campaigns, and sold tickets to political fundraisers on state time. (*Id.* at 10.) Yet another will testify that CFR agents authorized diversion of state workers for six to eight weeks during the 1998 campaign. That witness will also testify that CFR agents shredded Secretary of

State documents at a campaign office and then took the shreddings to their own homes rather than the local dumpster. (*Id.* at 11.) One more has testified that she followed directions from a CFR official to box up for removal copies of checks relating to previous fundraisers and to cease retaining copies of such checks. (*Id.* at 11-12.) In fact, each of the ten witnesses appears to have given damaging testimony before the grand jury. Nevertheless, the court will accept their word that these witnesses have not told Altheimer lawyers anything different than what they told government agents or the grand jury, and can accept their counseled waivers of any conflict with respect to the Firm's representation of CFR.

More troublesome is CFR's own waiver of the conflict created by its attorneys' inability to cross-examine, or even to argue the weight of, this damaging testimony. In its initial response to the motion to disqualify Altheimer, CFR argued that it "has no one left on its payroll or within its control" who knew what was in CFR's own documents or in the minds of its former employees and volunteers. (CFR Response Memorandum, at 2.) According to CFR, "The only persons who do have that knowledge . . . are the A & G lawyers and staff who have represented CFR . . . ." That assertion was arguably confirmed by the Affidavit of Bernie Weiner, CFR's treasurer. Weiner, who purported to waive conflict of interest on the part of CFR, frankly acknowledged that "I have never had day to day involvement in the operations of CFR and have no knowledge of those operations or of any of the matters with which I understand CFR has been charged." (Weiner Affidavit, Ex. 18 to CFR Response Memorandum, ¶ 2.) He earlier told government agents that he "is only a figure head" for CFR. (Reply

Memorandum, at 14.)

These representations concerned the court. It appeared that the only persons who had authority to waive their attorneys' conflict were the attorneys themselves. At a hearing on May 9, the court pressed those lawyers to identify the persons who authorized their actions and wrote the checks to pay for their services. In its subsequent written submission, CFR has identified its principal as Governor George Ryan. Mr. Ryan states under oath that he is the beneficiary of CFR and in that capacity he "endorse[d] and adopt[ed], the decision to waive any conflict of interests arising as a result of A&G's representation of CFR in these proceedings." (Declaration of Governor George H. Ryan, Ex. 16 to CFR's Supplemental Submission.)

The court is concerned for protecting the integrity of the process and the rights of each Defendant and witness. Under some circumstances, it might also be concerned about the wisdom of a defendant's decision to waive the right to have its own attorneys cross-examine critical government witnesses. In the circumstances presented here, however, the court believes CFR has made a competent and counseled decision concerning the issue and is not inclined to second-guess a determination made by a responsible official with full access to relevant information. As the court noted at oral argument, it is difficult here to imagine CFR's raising the issue of conflicted counsel on appeal. Were the Firm's representation of government witnesses the only issue raised by the government in its motion, the court might well conclude that Mr. Breen's appearance as additional counsel to cross-examine these witnesses, coupled with the waivers executed by the witnesses themselves and by Mr. Weiner and Mr. Ryan, were

20

sufficient to deny the motion.

## Government's Delay in Asserting this Objection

Finally, the court turns to CFR's objection to the timing of this motion. The government has known for years that the Firm represents CFR, and the fact that this motion was not raised earlier resulted in CFR's investment of substantial time and resources in working with the Firm's lawyers on its defense. Although the parties have not cited case law on this issue, there can be no dispute that the government has an obligation to bring a disqualification motion at an early stage. *See United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir.1986) (government acted improperly in using defense counsel's conflict of interest to impeach evidence before the jury rather than moving for disqualification before the trial); *cf. United States v. Falzone*, 766 F. Supp. 1265, 1273 (W.D.N.Y.1991) (government should not have delayed disqualification motion for nearly a year after return of indictment, but defendant was not prejudiced by such delay).

Here the government did in fact raise the issue at the arraignment and filed its motion to disqualify one week later. *Compare United States v. Lamer*, No. Cr. A. 87-33, 1987 WL 8558, *3 (E.D. Pa. 1987) (overruling timeliness objection to motion to disqualify filed after indictment, "[g]iven the questionable standing of the government to seek disqualification of an attorney prior to the institution of any formal criminal or grand jury proceedings against the attorney's client."). In any event, the government argues, it has raised conflict issues with the Firm for many months during the grand jury proceedings. Government lawyers repeatedly expressed concerns about

conflicts in Altheimer's representation of dozens of CFR and Secretary of State Office employees. On not one but five occasions, the government moved for disqualification before the Chief Judge, who granted the motion in each instance, despite several witnesses' written waivers of any conflict. Although those motions were directed at the propriety of the Firm's representation of individuals, this court agrees with the government that this motion can hardly be an unexpected surprise to lawyers who agreed to represent so many individuals and entities in the investigation stage.

Notably, in response to this motion Altheimer has argued that many of the conflicts about which the government has expressed concern are speculative. Until they ripen, presumably this motion is premature. But the effort to bring the matter of a disqualifying conflict to the court's attention cannot be both premature and tardy. In any event, the government's strongest argument for disqualification is the Firm's earlier representation of Scott Fawell. That argument could not have been made at all prior to the return of an indictment against Mr. Fawell.

CFR's timeliness objection to this motion is overruled.

## CONCLUSION

The court recognizes that disqualification of CFR's chosen counsel is a harsh remedy which should only be a last resort. For the reasons described above, the court concludes that some of the conflicts can be or have been adequately addressed by knowing and voluntary waivers. With respect to the Firm's prior representation of the Mr. Fawell, however, the court concludes the Firm may not proceed here absent an unequivocal waiver. Mr. Fawell's waiver appears to be open to change as the

circumstances evolve. The Firm's prior representation of the Office of the Secretary of State also generates concerns, and that Office has expressly declined to execute a waiver. The court concludes in the interests of justice that CFR should not be represented by counsel affected by these unwaived conflicts. The government's motion to disqualify is granted.

ENTER:

Dated: June 10, 2002

REBECCA R. PALLMEYER
United States District Judge