# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 310 - 1, 2 | **DATE** | 7/8/2003 |
| **CASE TITLE** | USA vs. Scott Fawell, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion And Order. Motion for arrest of judgment, judgment of acquittal, or a new trial (Doc. Nos. 223-1, 2, 3) are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | 5 number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | | JUL 0 9 2003 date docketed | |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | | | 237 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | U.S. DISTRICT COURT 03 JUL -8 PM 4:51 | docketing deputy initials 7/8/2003 | |
| ETV | courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice ETV mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 02 CR 310 |
| | ) | |
| SCOTT FAWELL, | ) | Judge Rebecca R. Pallmeyer |
| CITIZENS FOR GEORGE RYAN, SR., | ) | |
| RICHARD JULIANO | ) | |

DOCKETED JUL 0 9 2003

## MEMORANDUM OPINION AND ORDER

Following an eight-week trial, Defendants Scott Fawell and the Citizens for George Ryan ("CFR") were convicted of offenses including racketeering, mail fraud, and obstruction of justice. The evidence established that Fawell and others, including cooperating witness Richard Juliano, engaged in a long-term effort to divert personnel and resources of the Office of the Illinois Secretary of State ("SOS") for the benefit of a partisan political organization, Citizens for Ryan, and the campaigns supported by that organization. Fawell and CFR have filed a joint motion for new trial, motion to arrest the judgment, and motion for a judgment of acquittal notwithstanding the verdict. The court denied those motions orally at the sentencing hearing on June 30, 2003. This order explains briefly the reasons for the court's ruling.

**Challenges to RICO Charge**

Defendants argue, as they did in pretrial motions, that the indictment's RICO allegations are insufficient because the Secretary of State's Office can not be both part of the RICO enterprise and the alleged victim of CFR's wrongdoing. In earlier briefing, the United States has argued that the language of the RICO Act and its legislative history support the conclusion that a legitimate entity can be both part of the enterprise and a victim of its activities. (Reply Memorandum in Support of Motion to Disqualify, at 5-7.) See, e.g., United States v. Goldin Industries, Inc., 219 F.3d 1268, 1270 (11th Cir. 2000) ("the [RICO] enterprise itself can be a passive instrument or victim of the racketeering activity"); Aetna Casualty and Surety Co. v. P Y B Autobody, 43 F.3d 1546, 1557 (1st

237

Cir. 1994) ("Under § 1961 an enterprise may include a legitimate legal entity like Aetna as the victim of the racketeering activity"); *LaSalle Bank Lake View v. Seguban*, 937 F.Supp. 1309, 1322-24 (N.D. Ill.1996) (after Seventh Circuit questioned whether enterprise can also be victim, district court on remand rejected conclusion that simultaneous role is not possible). In *Shapo v. Engle*, No. 98 C 7909, 1999 WL 1045086, *8 (N.D. Ill. Nov. 12, 1999), Judge Kocoras of this court declined to dismiss a civil RICO complaint against an enterprise comprised of an insurance company and its managers, concluding that the RICO complaint did not fail merely because it named the insurance company as both a part of the enterprise and its alleged victim. The court recognizes that the case law is unsettled on this issue, but for the reasons explained by Judge Kocoras, this court concludes that the indictment's identification of SOS as both an instrument and a victim of the RICO enterprise does not support dismissal of the indictment.

Defendants' vagueness challenge to RICO fares no better. The Seventh Circuit concluded in *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991) and *United States v. Korando*, 29 F.3d 1114, 1119 (7th Cir. 1994) that RICO is not unconstitutionally vague. "RICO is a remedial statute only. It does not make criminal activity that is otherwise legal; it only increases the sanction for engaging in activity that is already forbidden." *Korando*, 29 F.3d at 1119. So long as the statutes criminalizing the predicate acts are not unconstitutionally vague, defendants are on adequate notice that their conduct is criminal.

Defendants here argue that the mail fraud statute is in fact unconstitutionally vague. That argument is addressed below. The jury did find that Defendants committed predicate acts of mail fraud, but it also convicted Defendants of official misconduct in connection with issuance of low-digit license plates (Racketeering Act 3(b)); of obstruction of justice in connection with shredding documents (Racketeering Act 13(b) [both Defendants]); Racketeering Act 14(a) [Defendant CFR only]); and of perjury (Racketeering Act 15 [Defendant Fawell only]). Their objection to the RICO charges is overruled.

2

Finally, although Defendants did not raise the matter prior to trial or in the instructions conferences, they now argue that official misconduct is not a predicate act for purposes of the RICO statute. Apart from their observation that official misconduct is not identified as a predicate act of racketeering in 18 U.S.C. § 1961(1), Defendants offer no authority for this argument. It does, however, find support in the Seventh Circuit's recent decision in *United States v. Genova*, Nos. 02 1502, 02-1650, 02-1914, 02-2053, ___ F. 3d ___, 2003 WL 21418411 (7th Cir. June 20, 2003). Judge Easterbrook's opinion in that case notes the Seventh Circuit's earlier holding that a violation of the Illinois law prohibiting official misconduct, 720 ILCS § 5/33-3(d) constitutes a predicate act under RICO where the violation constitutes "a species of bribery." *Id.* at *5, citing *United States v. Garner*, 837 F.2d 1404, 1417-79 (7th Cir. 1987). In *Genova*, defendant had violated a different section of the Illinois law, § 5/33-3(c); because that section "does not read like a definition of bribery . . . [it] therefore may not be used as a predicate offense under RICO." *Genova*, 2003 WL 21418411 at *4.

The relevant provision reads as follows:

§ 33-3. **Official Misconduct.**

A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:
. . . .
c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority;
. . . .

720 ILCS 5/33-3.

In *Genova*, the jury found defendant guilty of official misconduct only because he had failed to disclose the receipt of bribes in his Statement of Economic Interest, the economic disclosure report required annually under Illinois law. *See United States v. Genova*, 187 F. Supp. 2d 1015, 1019 (N.D. Ill. 2002). This conduct, the Court of Appeals concluded, can not fairly be characterized as akin to bribery. The indictment in this case, by contrast, refers to the same provision of Illinois

3

law involved in *Genova*, but makes no mention of an incomplete or inaccurate financial disclosure. Instead, the allegations concerning Predicate Acts 3(b) and 4(b) charge that Defendants, together with Larry Hall, committed official misconduct and "solicited, aided, and abetted this offense" in that they "caused the issuance of a low-digit [license] plate in return for" a campaign contribution. This language reads like an example of the *Genova* court's common-sense description of bribery: "paying for official tasks that the employee is supposed to perform, without outside financial influence, as part of his job." 2003 WL 21418411 at *5. Defendants correctly note that the jury did not find Defendants guilty of bribery arising out of the transactions involving Larry Hall; the jury instructions concerning bribery differed from those concerning official misconduct, however, and the jury might have concluded from those instructions that Defendants were not guilty of bribery unless they had actually received money, or a financial commitment, from the license plate applicant.

This court concludes the jury's failure to make findings on the charged bribery acts does not require that Defendants be acquitted on the official misconduct allegations. In any event, the jury's findings that Defendants committed predicate acts of mail fraud, obstruction of justice,[1] and perjury provide ample predicate for the RICO convictions. *See Genova*, 2003 WL 21418411, *5 ("[b]ecause the jury returned special verdicts identifying particular racketeering acts, we know that it determined beyond a reasonable doubt that Genova committed at least two mail frauds, and there is no good reason to think that the verdicts finding mail fraud predicates could have been influenced by the incorrect jury instruction about treating 720 ILCS 5/33-3 as a form of bribery.")

**Challenges to Mail Fraud Charges**

Defendants argue that the mail fraud statute, 18 U.S.C. §§ 1341 and 1346, is

---

[1] Defendants argue that their convictions of obstruction should be vacated because "instructions to clean an area or move documents" do not constitute obstruction. The argument bears little discussion. Instructions to clean an area or to move documents do constitute obstruction when such instructions are given to interfere with enforcement of a subpoena.

4

unconstitutionally vague on its face and as applied because it does not adequately define the terms "fraud," "property" and "honest services." The Second Circuit decision they cite, *United States v. Handikas*, 286 F.3d 92 (2d Cir. 2002), held the phrase "honest services" was unconstitutionally vague as applied to a contractor working for a state school authority who was charged with willful breach of a contract requirement that he pay the prevailing wage to his employees. In numerous other cases in that circuit and others, courts have rejected vagueness challenges to the application of § 1346 to "honest services" fraud. *See, e.g., United States v. Frega*, 179 F.3d 793, 798, 803 (9th Cir.1999) (rejecting a vagueness challenge by an attorney convicted under § 1346 for bribing a state court judge); *United States v. Frost*, 125 F.3d 346, at 352, 370-71 (6th Cir. 1997) (a university professor who helped students to obtain degrees by fraud in exchange for their influence in obtaining government contracts); *United States v. Gray*, 96 F.3d 769, 772, 776-77 (5th Cir.1996) (basketball coaches who helped students obtain academic eligibility by fraud); *United States v. Castro*, 89 F.3d 1443, 1447-48, 1455 (11th Cir.1996) (attorneys who paid kickbacks to state court judges to obtain appointments as public defenders); *United States v. Bohonus*, 628 F.2d 1167, 1173 (9th Cir. 1980) (insurance manager who received payments through the mail in accordance with a kickback scheme with the intent to defraud his employer).

Defendants have also cited *United States v. Martin*, 195 F.3d 961 (7th Cir. 1999) in support of their argument. In *Martin*, the court affirmed the mail fraud conviction of a state employee who had provided favorable treatment to a state contractor in exchange for bribes. The *Martin* court recognized a concern that the failure to define "fraud" in the statute might invite prosecutorial overreaching, but nevertheless affirmed the employee's conviction under the theory that he had deprived his employer of the right to his honest services. *Id.* at 965-66. Notably, although the Court of Appeals pointed out that a legislator's acceptance of campaign contributions from special interests does not by itself support an inference that the legislator acted unlawfully in taking particular positions, such a situation is distinct from one in which there is an "explicit quid pro quo

5

or even some positive act by the official to assist the donor." *Id.* at 965. In this case, the court agrees with the government that the line should have been clear to Mr. Fawell when he crossed it: "[A] high-ranking public official may not systematically divert state assets and resources and effectively sell his office for personal and campaign benefit without defrauding the public of its right to his honest services." (United States' Consolidated Response to Defendants' Pretrial Motions, at 8.)

Defendants' only other argument relating to mail fraud is that "States and State agencies do not constitute 'another' within the meaning of 18 U.S.C. § 1346." (Defendants' Post-Trial Motions, at 2 ¶ 3.) Defendants do not otherwise amplify this argument or cite any case law in its support. In *United States v. Farley*, No. 97 CR 441, 1997 WL 695680 (N.D. Ill. Oct. 31, 1997), a "ghost payrolling" prosecution, defendants argued that the term "another" in § 1346 is "ambiguous and should not be construed to permit mail fraud charges against defendants who allegedly defraud a county agency, a county, or its citizens of the intangible right to honest services." 1997 WL 695680 at *3. Defendants suggested that the word "another" implied that only an entity itself capable of committing mail fraud could be a victim of such a fraud. Judge Gottschall of this court characterized this interpretation as "strained" and denied defendants' motion to dismiss the indictment. Absent any further explanation from Defendants Fawell or CFR, the court overrules their objection to the language of § 1346 for the same reasons.

**Objections to Form of Indictment**

Defendant Fawell argues that Count Six should have been dismissed on multiplicity grounds because the perjury allegations "charge more than one offense." The court notes, first, that multiplicity challenges ordinarily make the reverse argument; Wright and Miller define "multiplicity" as "the charging of a single offense in several counts." 1A FED. PRAC. & PROC. CRIM .3d § 142 (1999). In this case, the government's decision to charge four instances of perjury in a single count

6

arguably benefitted him; the jury found him guilty on three sub-paragraphs of Count Six, but this resulted in a conviction of only one count of perjury. In any event, Fawell has not explained how he was prejudiced by the government's decision to charge four alleged instances of perjury in a single count.

To the extent Fawell intended to challenge Count Six as duplicitous, as he did in pretrial motions, the court again rejects this challenge. As the Seventh Circuit explained in *United States v. Isaacs*, 493 F.2d 1124, 1154-55 (7th Cir. 1974), in a perjury indictment, "all the false declarations pertaining to [a single] offense can be charged in one count without making that count duplicitous." Here, each of the alleged false statements related to the common topic of fundraising. Significantly, the jury found that Fawell committed three of the four alleged acts of perjury, but did not find against him on a fourth alleged act. The use of a special verdict form for this count thus eliminated any danger that, due to a duplicitous charge, Fawell might have been convicted by a less than unanimous verdict.

Defendants also challenge the court's failure to grant their motion for a bill of particulars. Defendants moved for specific identification of the "duties, laws, policies and procedures" they allegedly violated. The court granted that motion on November 27, 2002, directing the government to provide specific citations by December 9, 2002. The court has no reason to believe the prosecution failed to do so, nor have Defendants otherwise explained how any lack of specificity prejudiced them.

This court routinely sends a copy of the indictment, together with the instructions and exhibits, with the jury when it retires to deliberate. Although they concede that the jurors were entitled to review the charging language of the indictment, Defendants argue that providing them with a copy of the entire document was error in this case. The 81-page indictment contained a lengthy preamble describing the Secretary of State's office and the George Ryan campaign apparatus, and, in Defendants' view, improperly invited the jurors to consider violations of Secretary

of State Office policy as evidence of guilt. The court itself might have preferred a shortened version of the indictment for review by the petit jurors. The court did not believe that Defendants' request for a wholesale elimination of the preamble was appropriate, however, nor was it inclined to redact portions of the grand jury's findings on its own. More importantly, the court believes the jury was appropriately instructed concerning the findings necessary for a conviction in this case. The care with which they deliberated and discernment exhibited in their verdict form bolsters the conclusion that they made no thoughtless rush to judgment. If the court erred in adhering to its practice of furnishing a full copy of the indictment in this case, it concludes the error was harmless.

**Change of Venue, Jury Selection**

Prior to trial, Defendants filed a motion for change of venue, arguing with great force that massive pretrial publicity concerning Mr. Fawell's conduct destroyed the possibility that a fair jury could be selected in this district. The court took those concerns seriously, stating its willingness to move the trial to another district in the Seventh Circuit if the *voir dire* process demonstrated that the jury pool had been tainted. In fact, with the cooperation of the Circuit Executive, the court made tentative arrangements for the use of a courtroom in Milwaukee, Wisconsin.

The court is satisfied, however, that the jury selection process resulted in a fair and impartial jury in this case. Jurors were first screened for their availability for a trial of six to eight weeks. Those persons not excluded for scheduling reasons completed a lengthy questionnaire, drafted by the parties, which explored potential sources of bias in depth. Several potential jurors were excused based upon their written responses alone, by agreement of counsel. Those not screened out were questioned, one by one, *in camera*. The court erred, if at all, on the side of sustaining the bulk of defense counsel's cause challenges. Then-Governor Ryan announced his clemency decision over the weekend after jury selection had begun; in response to the concerns raised by that announcement, the court again questioned each juror who had, to that point, survived the initial

screening, and excused jurors who expressed reservations about Governor Ryan's decision or his motivations. To further eliminate any possible prejudice, the court granted each side additional peremptory challenges. Ultimately, 16 jurors were selected, and each showed up on time every day over a nine-week trial.

The court is satisfied that the time-consuming process described above resulted in a fair jury. Defendants' motion for a new trial on this basis is denied.

Defendants' final argument relating to jury selection is a surprising one: Defendants contend that because of pretrial publicity, the jurors became aware of "prejudicial extra-judicial evidence," for example, Mr. Fawell's use of prostitutes and infidelity to his wife. The court had expressed clearly its distaste for such evidence and its intention to permit its admission only if the government could directly link it with the charges in this case. Defendants now contend they were prejudiced because the court ultimately sustained their own objections to introduction of that evidence, on foundation and relevance grounds. It was Defendant Fawell's own attorneys who "fronted" these matters with potential jurors. He has not explained how the court could have prejudiced him by sustaining his own objections to prejudicial evidence.

**Evidentiary Rulings**

Defendants challenge a number of the court's evidentiary rulings. The court reviews them briefly here:

**1.     Co-conspirator Statements:** First, they argue that the court erred in admitting out-of-court statements that did not qualify as co-conspirators' statements under Rule 801(d)(2)(E). Defendants do not identify which statements were improperly admitted, however, and the court notes it did in fact sustain objections to many such statements. Without more specifics, this argument can not be the basis for a new trial.

Defendants are only slightly more specific in their challenge to the admission of hearsay

9

statements of Roger Bickel and Roger Stanley. Richard Juliano testified concerning a statement that Mr. Bickel made to Defendant Fawell concerning bid requirements for a state contract. The statement was not offered for its truth, and the court specifically so advised the jurors.[2] For the reasons set forth in the government's pretrial *Santiago* proffer, the court admitted Mr. Stanley's statements as those of a co-conspirator. Defendants objected to Juliano's testimony concerning Stanley's offer to host a fund-raiser for George Ryan at the William Tell Inn, emphasizing that there is no evidence such a fund-raiser ever took place. The government stipulated to this, and the court advised the jury. Admission of Stanley's statements did not prejudice Defendants.

2. **Other campaigns:** Nor does the court believe Defendants were denied a fair trial due to the introduction of evidence regarding Mr. Juliano's work on the Bruce Clark campaign and on George Ryan's 1990 campaign. Assuming that, as Defendants assert, this evidence constituted "propensity" evidence, the error was harmless. The evidence consumed a very small amount of Richard Juliano's testimony, which continued for nearly five days. The court cautioned the government that no other evidence not disclosed in its *Santiago* proffer or Rule 404(b) disclosure would be admitted, and none was. The evidence concerning these campaigns did not deprive Defendants of a fair trial.

3. **Zip Disk:** Defendants objected to introduction of a computer "zip disk" maintained by Andrea Prokos, Mr. Fawell's assistant, arguing that the government did not establish the chain

---

[2] Specifically, the court stated:

> Ladies and gentlemen, you are about to hear from this witness about a statement made by Mr. Bickel. I instruct you this statement is not being offered for its truth. What that means is that Mr. Bickel's opinion about the legality of certain conduct is not for your consideration. The government is offering this evidence for another purpose. With respect to what's legal and what's not legal, matters of law are for my instructions to you, and I will give those instructions to you.

Transcript, January 15, 2003, at 128.

of custody. There was ample, far more damaging testimonial evidence, however, that Ms. Prokos maintained campaign-related records on her state office computer; that she and her then-husband and in-laws went to extraordinary lengths to dispose of documents she deemed damaging to her superiors; and that she and her husband discussed the wisdom of retaining the disk itself for use, if necessary, as a bargaining chip in the event criminal charges were brought against any of those involved in the effort to destroy documents. Given that the jury had no access to a computer, the disk itself was functionally no more than a demonstrative exhibit.

The more significant objection was to admission of documents printed from the disk. Defendants contend that the government failed to show who created the documents, or whether Fawell knew about them. The court effectively sustained this objection, and in a conference outside the presence of the jury, reviewed the documents one by one. (Transcript, at 5539 ff.) Ultimately the court admitted only those documents printed from the zip drive that bore indicia of the Defendants' involvement or knowledge. Defendants have not identified any specific document on which the court erred. In any event, the admission of these documents is not a basis for a new trial.

**4.     Grand Jury:** Defendants assert that they were prejudiced by the government's introduction of evidence concerning the scope and breadth of the grand jury investigation; but some evidence of this nature was required to demonstrate that Defendants' alleged obstruction and Defendant Fawell's alleged perjurious testimony related to matters material to the investigation. The court did not permit the government to present any more evidence than necessary to meet that burden and stands by its rulings on this matter, as well.

**5.     Fawell's Use of Profanity:** The government elicited a handful of statements attributed to Mr. Fawell in which he used the "f—" word in reference to others, including agents of the Investigator General. Defendants were on notice of these statements and made no effort to

seek a pretrial *in limine* order, nor was the government under an obligation to go further than it did in eliminating references to Mr. Fawell's potentially unattractive personality traits.

6. **Michael Eickhoff:** The court declined to permit Defendants to attempt to impeach Michael Eickhoff, a prosecution witness, concerning his failure to disclose an accusation that, records showed, had been made by a co-worker of Eickhoff's at the time of his resignation from another state agency. The alleged incident was wholly collateral to any matters at issue in this case; government agents had not asked the witness about it, so his failure to disclose it in an initial interview was of no moment; Defendants acknowledged they had no admissible evidence concerning the matter; and *in camera* examination of the witness demonstrated he would deny the accusation. The court believes this ruling was a proper exercise of its discretion under FED. R. EVID. 611(a)(3).

7. **Other Administrations:** With a few exceptions, the court sustained the government's objection to introduction of evidence concerning fundraising practices in other administrations, including that of Secretary Ryan's predecessor, James Edgar. Defendants argue these rulings were error because the evidence would have established that Defendants lacked criminal motive or intent. Respectfully, the court disagrees with this argument and stands by its rulings. The evidence here shows that Defendants, a political campaign fund and its chief executive, used state resources, including paper, vehicles, parking privileges, cell phone service, office equipment, and the time and effort of public employees, to conduct partisan political campaigns. Whether the practice was common or uncommon, it was improper and the charged activities were unlawful. The court did not bar Defendants from adducing evidence that some of the state workers continued to get their state-assigned work done, that some worked overtime, and that some took vacation time or unpaid leave rather than cheating the taxpayers. In addition, Defendants adduced evidence that when state employees performed political work in an effort to

achieve salutary public policy goals – tighter drunk-driving laws, for example – their work violated no legal or ethical standards. Defendants were entitled to argue that such evidence negated any unlawful intent. But the argument and evidence that "everybody does it" or that witnesses did not know they were violating the law was no more relevant here than it would be in a drug distribution prosecution.

Defendants are correct that, consistent with its rulings concerning previous administrations, the court ought also to have barred evidence concerning activities in the succeeding administration. The government presented evidence that jobs created while Defendant Fawell was Chief of Staff were eliminated once Jesse White succeeded George Ryan as Secretary of State. The court does not believe this evidence is strictly analogous to the "business as usual" evidence that Defendants argue should have been permitted. The court nevertheless concludes that the White administration's policies were no more relevant to this case than were the Edgar policies, and believes that its limiting instructions to the jury were adequate to make that clear.

**Larry Hall**

Under cross-examination, Larry Hall, a cooperating witness, volunteered the information that Tom Breen, one of the attorneys representing CFR, had previously represented Hall himself during the government's investigation of the charges in this case. Defendant Fawell's attorneys, Marc Martin, who had been conducting Hall's cross-examination, promptly asked for a side-bar conference, and CFR moved for a mistrial.

The court reserved ruling on the mistrial motion, but brought the jury back to complete Hall's testimony, and issued the following instruction:

> Ladies and gentlemen, we are going to proceed in just a moment with further cross-examination of Mr. Hall. I am going to strike the last question and answer from the record and ask that you disregard it. The fact that Mr. Hall was represented by a lawyer in the past is not relevant to this case at this time. I am going to ask that you not consider it. It's not unusual at all for someone to consult with a lawyer. There is nothing improper about it. Nor should you draw any

13

> inferences whatever from Mr. Hall's reference to a brief previous representation. The matter should simply not enter into your consideration in this case in any fashion at all.

(Transcript, February 25, 2003, at p. 5248.) Later the court denied Defendants' motion for a mistrial. Defendants contend that this instruction was insufficient and that the court erred in denying the motion.

Under the standard set forth by our Court of Appeals, a court should declare a mistrial only if a "scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Combs*, 222 F.3d 353, 360 (7th Cir. 2000) (citations omitted). The Supreme Court has described the "ends of public justice" as "the public's interest in fair trials designed to end in just judgments." *Id.*, quoting *Illinois v. Somerville*, 410 U.S. 458, 463 (1973) (additional citation omitted). Whether this standard can be met must be determined on a case-by-case basis. *Combs*, 222 F.3d at 360.

Often the matter of prejudicial testimony by a witness and its impact on a jury arises in the form of a comment about a witness or the defendant's criminal history. For example, in *United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996), the court ordered the government to instruct its witnesses not to mention that the defendant's prior conviction was aggravated or drug-related. The government's first witness nevertheless responded to a question by indicating that the defendant "was involved with a drug offense." *Id.* Then, during cross-examination, the same witness mentioned that the defendant was an "aggravated felon." *Id.* In affirming the district court's denial of a motion for a mistrial, the Seventh Circuit noted that "[i]t is not an abuse of discretion for the trial judge to issue a curative instruction after improper testimony is adduced at trial rather than grant a mistrial, so long as the instruction adequately addresses that aspect of the testimony which was improper or permitted an improper inference." *Id.* (citation omitted). The court noted the presumption that juries are capable of interpreting the evidence and following the court's instructions. *Id.* In *Lomeli*, the district court had instructed the jury that the witness was "mistaken"

about the defendant's criminal history, and that mistakes could be used to assess a witness's credibility. This instruction, the Court of Appeals concluded, adequately addressed the improper testimony. The court also remarked that the two misstatements "occurred early on the first day of a six-day trial, further mitigating their likely impact on the jurors." *Id.* at 150. In this case, Mr. Hall's single remark came near the end of a two-month trial, but was similarly buried by other evidence, and likely had little to no impact on the jury.

In *United States v. Forrest*, a government witness on direct examination during the rebuttal portion of the government's case stated that he was told approximately five months before trial that the defendant "had been paroled from the state penal institution for robbery." 17 F.3d 916, 920 (6th Cir. 1994). Defense counsel objected, and the court, sustaining the objection, instructed the jury to disregard those remarks. *Id.* On cross-examination of the same witness, the witness repeated that the defendant had been released from prison for robbery. *Id.* The defense counsel then sought a mistrial, which the court denied. *Id.* The court offered to make another instruction to the jury, which the defense declined. *Id.*

On appeal, the Sixth Circuit noted that the judge's admonition to the jury was "clear and immediate" after the blurted statement, and that "[j]uries are presumed to understand and follow such directions from the court." *Id.* at 920-21, citations omitted. In *Forrest*, as in an earlier case, the Court of Appeals concluded that a mistrial was not warranted "where an improper reference to an unrelated arrest of defendant was unsolicited; the government's line of questioning reasonable; the limiting instruction immediate, clear, and forceful; no bad faith evidenced by the government; and the reference itself only a small part of the evidence against defendant." *Id.* at 920, citation omitted. The court also noted that there was ample evidence introduced at trial on which to rest a conviction. *Id.* at 921.

The same factors convince this court that a mistrial was not warranted. First and foremost, the fact that Mr. Breen previously represented Mr. Hall is not clearly prejudicial to the Defendants,

15

unlike the testimony in *Forrest* of the defendant's criminal history.  As Assistant United States Attorney Levin persuasively argued during the side-bar on this matter, the significance of Mr. Hall's statement about Mr. Breen's representation may well have been lost on the jury.  Furthermore, there is no indication of any improper motive or bad faith on the government's part; significantly, the testimony about Mr. Breen came out on cross-examination.  Any suggestion that the government somehow solicited this admission would be a stretch; to the contrary, Assistant United States Attorney Collins informed the court that he had no discussion with Mr. Hall regarding whether Hall should mention Mr. Breen's prior representation.  The court's limiting instruction, which was the next thing the jury heard after Mr. Hall's misstatement, was clear and forceful. Finally, the court is not convinced that the reference to Mr. Breen, made during the course of a two-month trial in which substantial evidence was presented against both Defendants, had any effect on the jury's verdict.  For these reasons, the court stands by its decision that a mistrial was not warranted here.

**Instructions**

Defendants object to a number of the court's instructions to the jury.  The court notes, preliminarily, its uncertainty about whether these objections were effectively preserved. Defendant Fawell's attorneys handed up a memorandum on the matter after the instructions were given; but counsel represented that that document simply memorialized the objections they had voiced in earlier instructions conferences.  To the extent Defendants' objections, whether stated in their memorandum or in these motions, were not presented to the court during the instructions conference, the court believes they were waived.

1.  **"Ostrich" instruction:** Defendants did object vigorously to the "ostrich" instruction. The court struggled with the issue but concluded, for the reasons stated in the record, that the evidence supported such an instruction.  There was substantial evidence of Mr. Fawell's actual

knowledge of unlawful activities; but the evidence also presented circumstances consistent with a conclusion that Mr. Fawell should have known of wrongdoing but chose not to investigate. Kevin Wright's report to Fawell that car dealers had complained of being "shaken down" by Mark Battista furnishes one example. There was also evidence that Mr. Fawell in some cases knew, and in others should have known, that SOS workers were devoting substantial time to campaign work, often substantially in excess of the percentages allocated by the "split salary" arrangements developed by Mr. Fawell and Mr. Juliano.

2.  **Mail fraud instructions:** Defendants' objections to the mail fraud instructions are legal arguments addressed earlier. To the extent that Defendants argue that those instructions transformed a state law violation into mail fraud, the court disagrees and notes that Defendants have not identified the language that could so have misled the jury. Nor did the instructions permit a conviction based solely on proof that Defendants acted to promote an "antagonistic private agenda." This language, adopted from *Toulabi v. United States*, 875 F.2d 122, 126 (7th Cir. 1989)[3] may not be an ideal phrase for use in charging a jury, but the court believes it was not prejudicially misleading.

Citing *Scheidler v. National Organization for Women*, ___ U.S. ___, 123 S.Ct. 1057 (2003), Defendants argue that the court erred in instructing the jurors that the mail fraud statute can be violated even when there is no loss to the victim. Nothing about *Scheidler* calls that instruction into question, however. The focus of *Scheidler* was on what constitutes "property" for purposes of a Hobbs Act violation; the Court held there that anti-abortion protesters did not obtain or attempt to

---

[3] *Toulabi* reversed the denial of a § 2255 petition, applying the holding of *McNally v. United States*, 483 U.S. 350 (1987), that deprivation of intangible rights to honest services did not in itself violate the mail fraud statute. In 1988, Congress reacted to *McNally* by amending the fraud statutes so that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346 (1988).

17

obtain property when they interfered with and shut down abortion clinics. The *Scheidler* court repeatedly uses the phrase "obtain or attempt to obtain," demonstrating that an effort to obtain property may be a Hobbs Act violation, even if it is unsuccessful. Here, there was ample evidence of a scheme on the part of Defendants to defraud another (that is, the Secretary of State's office) of its money, property, and the "honest services" of Fawell and other SOS employees.

**Miscellaneous**

Defendants raise a handful of additional arguments: a challenge to the sufficiency of the evidence; a *Giglio* matter; and a concern regarding the cross-examination of Pate Phillips. The court addresses these in turn.

First, Defendants' challenges to the sufficiency of the evidence need not detain the court. The court must review the basis for the jury's verdict "in the light most favorable to the government . . . and [must] uphold the conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir.1998) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The court may overturn the conviction "only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* (citations omitted). Meeting that test presents "a nearly insurmountable hurdle to the defendant." *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998) (quotation omitted). Defendants here have not surpassed the hurdle. In particular, they challenge the convictions on racketeering acts involving Ken Olson and Michael Eickhoff, but the "manpower matrix" drafted by Defendant Fawell defeats his argument that he had no knowledge that these state workers were in fact devoting the bulk of their time to 1996 Congressional campaigns.

Defendants argue that the court erred in failing to require production of certain material relating to a government witness that came into the prosecutor's hands only after that witness had

testified. In fact, as the government asserts (Government's Consolidated Response, at 9-10), despite doubts whether the information at issue constituted *Giglio* material, the court did require its production. Defense counsel chose not to use the information–an apparently appropriate tactical decision–but were not precluded from doing so.

Finally, it was Defendants who insisted on calling Pate Phillip, over the government's vehement objection. They now concede that the government had no obligation to provide copies of documents it intended to use in cross-examination of Mr. Phillip, but urge that the government should have adhered to the parties' mutual agreement to provide advance notice of such materials. The government ultimately did provide Defendants' attorneys with access to materials it intended to use to cross-examine Mr. Phillip. The fact, if true, that the disclosure took place later than Defendants would have wished did not result in reversible error.

## CONCLUSION

The Constitution does not guarantee a perfect trial--only a fair one. *United States v. Harris*, 271 F.3d 690, 704 (7th Cir.2001), citing *Michigan v. Tucker*, 417 U.S. 433 (1974). The court recognizes the trial in this case may not have been perfect, but concludes it was indeed a fair one. The evidence amply established the Defendants' guilt on each of the charges. Their motion for arrest of judgment, judgment of acquittal, or a new trial (Doc. Nos. 223-1, 2, 3) are denied.

ENTER:

Dated: July 8, 2003

REBECCA R. PALLMEYER
United States District Judge